SQUIRES (FIELDS v.). See Case No. 4,776.

SQUIRES (HANKIN v.). See Case No. 6,025.

SQUIRES (HULBURT v.). See Case No. 6,855.

---

## Case No. 13,272.

### SRODES v. The COLLIER.

[9 Pittsb. Leg. J. 73; 2 Pittsb. Rep. 304; 3 West. Law Month. 521.]

District Court, W. D. Pennsylvania. July 16, 1861.[1]

MARITIME LIENS — STATE LIEN FOR SUPPLIES — MORTGAGE—PRIORITIES—NOTES TAKEN—LIEN FOR INSURANCE—ATTORNEY'S FEE.

1. A mortgage upon a vessel, recorded under the act of July, 1850 [9 Stat. 440], in the distribution of the fund arising from the sale of the mortgaged vessel, must be postponed to the liens for supplies and repairs under the acts of Pennsylvania for the attachment of vessels, even though the indebtedness for the supplies or repairs may have accrued subsequent to the recording of the mortgage.
[Cited in The Hiawatha, Case No. 6,453.]

2. A mechanic having a lien upon a vessel, who receives a note for the same, cannot institute proceedings against such vessel, until the maturity of the note, but may intervene, notwithstanding the note may not be due, and be paid out of a fund, where the proceedings have been instituted by other parties.

3. Under the Pennsylvania attachment act of 1858, the acceptance of notes or other securities for an existing demand, which would entitle the party to a lien upon a vessel, is to be regarded as a collateral matter, which can in no way work a satisfaction or extinguishment of the lien within the two years given by the act, until the indebtedness represented by such notes, &c. be fully paid.

4. Hence, the fact that the note-taker includes an indebtedness against another vessel, not embraced in the libel, will not prevent a recovery upon the original demand, so long as the note remains in the hands of the lien creditor. Neither would the fact that the mechanic had indorsed a new note, which the owner of the vessel had negotiated, and with the proceeds lifted the original note given to the former for his demand, and that, thus, the original note had passed into the hands of the owner and maker.

5. A mechanic may proceed upon his original lien, even though he may have taken a note

---

and receipted his original bill, if it be not shown that there was a contract to take the less security and release the better.

6. The assignee of a boat note may, without losing his lien, under the act, renew his note held by him, and pass the original to the maker.

7. It is sufficient evidence that the articles were necessary, under this act, to show that the articles, &c., for which a lien is claimed, were ordered and furnished, and that from their nature they seem to be necessary.

8. To maintain a lien for insurance, the insurer must hold a note, or other acknowledgment of indebtedness, given for the premium of such insurance, totally disconnected from all other transactions between the parties, whether insurers of other boats or articles, or otherwise.

[Cited in The Jennie B. Gilkey, 19 Fed. 131.]

9. The lien for supplies will not follow portions of a vessel which may have been used in the construction of a new vessel.

10. No attorney's fee can be paid to intervenors under this act, but one attorney fee being allowable in a case; and the fees of sheriff in such cases can not exceed one dollar for each person served.

This was a libel in admiralty.

The facts of this case are fully detailed in the following report by John H. Bailey, Esq., commissioner, to whom the matter was referred:

"To the Hon. Wilson McCandless, Judge of said Court: In pursuance of an order of your honorable court, made in the above cause, on the 26th day of last month, by which it was referred to me to ascertain and determine the amounts due the libellants and intervenors, and whether any have or are entitled to priority of payment, and to classify the different claims and appropriate the money in court, if sufficient to pay the whole of said claims; and if not, to ascertain the pro rata amounts coming to the said parties, and make report of the same to the said court, without delay, I proceeded to the discharge of the duties so enjoined, and beg leave to submit the following:

" 'Report: The claims presented for allowance, consist of (1) Seamen's wages, and herein of a claim of Thomas Adley. (2) Alleged maritime liens, being for wharfage at the port of Pittsburgh, and hospital dues arising under the act of congress of July 16, 1798. (3) Attachments by domestic creditors, under the state laws for the attachment of vessels, out of the district court of Allegheny county, and court of common pleas. (4) Mortgage against said vessel in favor of James Laughlin, trustee of the Pittsburgh Trust Company, and the Merchants' & Manufacturers' Bank of Pittsburgh, dated December 30, 1859, and recorded in the custom house of the port of Pittsburgh, January 4th, 1860.' Considerable testimony was taken on the hearing before me, which is herewith filed, and made part of this report. Respecting the libels for wages of John M. Srodes, Patrick Crawford and Thomas Hanna, there was no controversy, and that of Thomas McCloskey has been allowed among the liens under the state law, that claim having also intervened there. The

claim of Thomas Adley having been objected to, I have disallowed, the service being in no sense maritime in its character. The claim for wharfage was not disputed, nor any objection made thereto; and that for hospital dues, though not presented in any formal manner, it was agreed by the counsel of the parties, should be allowed.

"Before proceeding to consider the objections urged against the several libels filed, I propose to pass upon a preliminary question, which is urged with great zeal—that is, the question of priority between the attachments under the state law, and the mortgage, which has intervened. It is contended that the act of congress of July 29, 1850, was designed to give a recorded mortgage priority over everything but a strictly maritime lien against the mortgaged vessel; that the recording operates as a delivery of possession, and that claims of domestic creditors, such as are provided for by the state law for attachment of vessels, not being recognized and enforced in admiralty, must be postponed to a recorded mortgage. We must then examine the question of priority thus raised. I may state that on or about July 14, 1860, the steamboat Collier was attached by the sheriff of Allegheny county, upon process issued out of the district court and court of common pleas of said county. Subsequently, on the 1st day of March, 1861, by consent of the libellants and intervenors in said courts, (as will appear by copy of their agreement, part of the testimony filed,) the lien of the sheriff was released, and the vessel attached by the marshal upon process out of this court. By this means, the attachments out of the state courts have arisen, and been brought here for allowance, rather informally, it is true, but yet without any objection as to the mode pursued. By the established law, and by virtue of the twelfth rule in admiralty, ordered by the United States supreme court, 'where by the local law, a lien was given to material-men for supplies, repairs, &c., the libellant might proceed against the ship and freight in rem,' with all the effect and rights, as though he had an original maritime lien. It was a question in the case of Dudley v. The Superior [Case No. 4,115], whether those having original admiralty liens, and those who obtained theirs under the local law, did not occupy the same rank of privilege. Under such a state of the case, it would seem clear that the liens given by the municipal law, if enforced in admiralty, would take precedence of a mortgage. Now, by the modification of the rule, ordered to take effect about a year since, the remedy in admiralty only would seem to be taken away. There would seem to be no reason why the modification should have at all impaired the rights of such libellants, as against the remnants and surplus remaining in the registry after satisfaction of the maritime liens. But let us consider the nature of a mortgage of this character, and the arguments advanced in its support. The precise status of a mort-

gage of a vessel in a state, where, as in Pennsylvania, there are no statutory provisions for its enforcement, would seem to be a matter surrounded with considerable doubt. The mortgagee can not proceed in admiralty by libel to enforce his rights. He may be a claimant against libels filed, or he may intervene against the proceeds of the mortgaged vessel. His remedy in any other case would seem to be solely by action in debt, or in equity. Bogart v. The John Jay, 17 How. [58 U. S.] 401; Schuchardt v. The Angelique, 19 How. [60 U. S.] 241. He can not, therefore, have a maritime lien in the correct meaning of the term.

"But it is contended that the privileges of such a mortgage have been much enlarged by the act of congress, passed July 29, 1850, and that since its passage, such mortgage is entitled to payment out of the surplus, next after a bottomry-bond. I have failed to perceive the accuracy of this argument. The act provides that 'no bill of sale, mortgage, hypothecation or conveyance, shall be valid against any person, other than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof, unless such bill of sale be recorded.' There is also a proviso that the lien by bottomry 'shall not lose its priority, or be in any way affected by the provisions of this act.' To my mind, this act has rather restricted than enlarged the energies of an unrecorded mortgage, and that such was the effect intended. Nor can it be claimed that the act intended to confer any greater rights upon a mortgage recorded under its provisions, than it possessed while unrecorded, before its enactment. It does not say that it shall enjoy such and such privileges, if the terms of the act be pursued, but that it shall not have such and such rights, unless a prescribed process be observed. This would have been absurd, had it not been supposed that these rights did attach to the mortgage, (though unrecorded,) before the passage of this act. For instance, the recording of such a mortgage would now visit with notice of its existence, a subsequent purchaser from the mortgagor, while an unrecorded mortgage would be of no avail against him, without he had express notice thereof. Before the passage of the act, such unrecorded mortgage was considered good against even a bona fide purchaser without notice.

"It is argued, however, that the proviso to the first section contains the necessary implication, that were it not for its terms, even the lien by bottomry, if unrecorded, would have been postponed to a mortgage, and hence the latter must at least follow next in rank to bottomry. This is answered—in the first place, by the view already taken, that the act was not intended to create any new rights in behalf of such contracts; and, also, by the fact that the proviso was doubtless intended only to clear up a doubt that might have arisen from the general words of the act, whether lien by bottomry might not have been included within its terms, and the necessity enjoined upon the holders of such securities to record them, in order to render themselves safe. Again: A bottomry bond has priority over the liens of material men, upon a foreign vessel; and to elevate a mortgage to the next rank, would require that it, too, should postpone material men. It is quite clear that it never possessed any such energy, for it can only proceed against the remnants after such claims are fully satisfied. The Charles Carter, 4 Cranch [8 U. S.] 328; [Schuchardt v. The Angelique], 19 How. [60 U. S.] 241; [The Monte Allegre], 9 Wheat. [22 U. S.] 635. The act of 1850 was not passed to marshal the liens which arise under the maritime law, or to classify maritime contracts. Its purpose was very different from that suggested by the argument I have sought to answer. It was designed to set at rest many of the troublesome doubts that hung around the rights and liabilities of the mortgagees of vessels, and to prevent the continuance of secret liens upon such property, impairing its value, and often bringing heavy losses upon innocent purchasers. Its operation would seem to include every case where a transfer or incumbrance, absolute or qualified, is made in writing, and, therefore, capable of being recorded, with the exception (arising from its very nature) of a bottomry-bond, created in a foreign country, for the sole purpose of furnishing 'wings and legs to the forfeited hull to get back, for the benefit of all concerned,' and expiring with the life of the vessel. It will be seen that the act creates no new privileges for even this favored maritime contract, but it is left with precisely the rights it had before, or to use the terms of the proviso, 'not in any way affected by its provisions.' Every consideration which would favor the priority of those furnishing supplies or repairs in a foreign port, over a mortgage, will apply with almost equal force in favor of the priority of the material-man in the home port, as against the remnants or surplus, to which both he and the mortgagee must alike look for relief. He, too, furnishes the substance, needed to preserve the life of the vessel; he, too, enables her to perform her maritime mission, 'to plough the seas and not to rot in the docks'; and he, too, surely should be enabled to look to that, to whose value his means and his labor have contributed, as against one whose claim may have arisen from circumstances far removed from the maritime uses of the vessel. Should we regard a mortgage of a vessel as a defeasible bill of sale, it would seem entirely clear that no greater rights could be ascribed to such qualified owner, as against material-men, than to one having the absolute property in such vessel. As the vessel is liable in the hands of the owner to a lien under the state law for materials, &c., there would seem no sufficient reason why a mortgagee should stand in any better attitude as to such creditors. Moreover, the amended twelfth rule in admiralty, before

referred to, which allows to material-men in the home port a proceeding in personam, recognizes the existence of a right enforcible in admiralty, which we have seen is not the case with a mortgage.

"I would refer to the case of Marsh v. The Minnie [Case No. 9,117], where the subject is ably examined, and also to Reeder v. The George's Creek [Id. 11,654]. The rule laid down in this latter case, as to the rights of mortgagees under the act of 1850, seems to me to cover the whole ground: 'That the act was intended to give recorded bills of sale or mortgages of vessels priority over any subsequent conveyance of them, made by those in possession, and over any rights acquired in them by general creditors, by judgments and by execution.' I must, therefore, hold that the mortgage here must be postponed to the attachments out of the courts of the state, whether the debts were contracted before or after the recording of the mortgage.

"I have thought it best to set out at some length the reasons which have impelled me to this conclusion, though for the purposes of this case, it would have been sufficient for me to have relied upon the judgment of this honorable court in Wilson v. The Grand Turk [Case No. 17,805], at No. 1, May term, 1860, where this very point was passed upon, and adjudicated, and the conclusion reached that a mortgage, similar to the present, must be postponed to attachment, under the state law, out of our state courts.

"The demands of Davage & Roberts, John C. Boyd, and A. Fulton, are undisputed. In all other cases in the state courts, notes were given by the owner of the Collier to the several mechanics for the amount of the work, and labor done, and materials furnished, as the case might be. Many of these cases differ in their details, raising various questions upon the construction of the act of assembly of this state, respecting the attachment of vessels, passed June 13, 1836, and especially of this supplement, dated April 20, 1858.

"The first question raised is the general one, whether the acceptance of a note by a mechanic for work done to a vessel, does not extinguish his lien. It is well settled, that taking a security from a debtor, of the same rank with an existing indebtedness, will not extinguish such indebtedness without such be the agreement of the parties. In no case here has there been any such substantive proof presented, except in two instances, where receipts were given, as will appear hereafter. But could any doubt exist upon this question, the act of 1858 has placed it at rest. Section 5 expressly provides that the lien 'shall exist in full force and effect as if no such security had been given.' So long, therefore, as the note or other obligation so given, shall remain in the hands of the lien creditor, the lien would still subsist. In a number of the cases, the notes or drafts received have not yet matured, and it is urged that parties in this position can not receive the amount of their demands here. It seems to me that where a mechanic, having a lien upon a vessel, receives a note for the amount of his claim, he can not institute proceedings against such vessel until the maturity of such note; but where proceedings are commenced by a third party, I can see no reason why he should be deprived of his money, simply because he has consented to give time to his debtor, which can in no way injure, but may much benefit other creditors. The owner of the Collier also owned another steamboat, the Vulcan, which has been sold on process out of this court, and whose proceeds are here for distribution, in No. 2 of May term, 1861. Most of those who have issued attachments in our state courts, and against the Collier, have like attachments against the Vulcan. In the course of their dealings, they have received from the owner of the two boats, one note covering the demands against both.

"It is contended that though the act of 1858 may sustain a lien in favor of mechanics who may have accepted notes for their demands, yet in order to sustain the original lien, the note must be specific and confined exclusively to the particular debt for which it is given, and if the party chooses to accept a note, which combines an indebtedness arising from repairs, &c., to another boat, his lien for the repairs made is gone. Bungling and obscure, as this act certainly is, I do not think language could more plainly express the design of the legislature to give the mechanic, and others named, a subsisting lien upon the vessel for repairs; and during the time limited, beyond any peradventure or contingency, so long as he did not assent to an extinguishment of his original claim. So emphatically is this stated, that it would almost seem as though the legislature had designed to deprive the mechanic of even the right to release his lien; for section 5 of the act reads: 'The taking or receiving of any note, &c., in settlement of a debt comprehended in any of the above enumerated classes, shall in no wise invalidate the lien given by this act.' It seems to have been the purpose to give the mechanic as many securities for his repairs, &c., as the debtor had it in his power to offer, and yet that the lien should still subsist against the vessel for the two years specified in the act. The policy of such a discrimination in favor of one class of creditors may well be debatable, but I have had no difficulty, from a careful study of the act under consideration, in arriving at the conclusion above expressed. There will be found filed with the testimony in this case exhibit 'X., J. H. B. Clk.,' a receipt of G. B. Kurtz for the amount of his claims against both the Collier and Vulcan, to the effect. 'Dec. 18, '60, rec'd payment.' This receipt is explained in the evidence to have been not for money, but for a note received for the gross sum of his demands at that

date. As a question of fact, I have no difficulty, from the testimony on this point, in determining that 'there was no contract to take the lesser security and release the better;' that 'there was no consideration given or intended to be given for the relinquishment of one of the mechanic's securities, nor did such an act enter into the contemplation of either of the parties at the time of the settlement.' Under the ruling in such circumstances of Grier, J., in Sutton v. The Albratross, 1 Phila. bottom of page 423, the giving of the receipt in this case cannot deprive the mechanic of his lien.

"These considerations dispose of the demands of the following parties: G. W. Coffin, G. W. Motherall & Co., G. B. Kurtz, and J. H. Jenks. Long & Duff, it seems, settled with the owner of the two boats every six months, and if the account was large enough, received a note for the amount; hence, they hold several securities of this character, the last of which is not due. It also appears that when one of these six months notes would mature, the same would at times be renewed, or extended by a new note, if the boat-owner's necessities demanded it. It does not appear that any of these notes, at any time, passed from the hands of Long & Duff, except into that of the owner, when a note was lifted or renewed.

"It is contended that where the note originally given has passed into the hands of the maker by renewal or otherwise, the lien for that indebtedness is gone. Andrew Adley's case differs from that of Long & Duff, in that, for his own accommodation and benefit, he discounted his notes received, with some of the banking institutions of the city. The note given in January last was also discounted, but was lifted before maturity by Mr. Adley. There is a class of cases here which differs in important particulars from most of those considered above, but the points raised in the last two cases will be covered in the consideration of this case, which includes Fitzsimmons & Morrow, J. S. Pringle, A. Hartupee & Co., Douglas & English, J. Irwin & Sons, and Wm. Nelson. These cases differ somewhat among themselves in their details, and I may lean a little more strongly against a particular case than the facts proven may warrant. With this explanation, the facts respecting these cases, as well as I can gather them, seem to be as follows: Notes were given, generally every six months, upon the settlement of the account between the parties arising out of repairs, &c., to the two boats for the current half year. These notes were discounted for the holder's benefit. When one of these notes would mature in the hands of the banking company, or was about to mature, the maker would call upon the original payee of the paper and obtain his indorsement upon new paper for the whole or some less sum, (as he might be able to pay a part upon account.) This new paper the owner of the boats could get discounted, and with the proceeds would lift the preceding note. In some, if not all instances, the first paper given was a note by D. Bushnell, agent, the owner of the boats, Jos. Bushnell, residing in Cincinnati. When this would mature, a draft by D. Bushnell, agent, on Jos. Bushnell, Cincinnati, would be the paper upon which the indorsement of the lien creditor would be obtained—and so each time a note or draft would fall due, Jos. Bushnell thus apparently meeting his paper at Cincinnati, as it matured. The drafts were generally discounted at Pittsburgh, and the proceeds transmitted to Cincinnati, to take up the old draft. In all the cases thus far spoken of, without exception, the notes or drafts, representing the existing liability for which a lien is claimed, are the property of the several libellants, and also, with the exception of J. Irwin & Sons, and Douglas & English, have been brought into court, and are now in the possession of the clerk of this court.

"It is contended upon these facts, that these libellants are but the accommodation indorsers of Mr. Bushnell, and in such relation, their original lien is gone. There is really no substantial difference between these cases, and that of Mr. Adley. It can make no difference to the creditors or defendant whether Mr. Bushnell got new notes discounted with the indorsement of A. Hartupee & Co. upon them and paid the discount, or whether he renewed the notes directly with A. Hartupee & Co., adding in or paying to them the discount, and they subsequently get them discounted. A. Hartupee & Co.'s liability would be neither greater nor less in either case, and their relation to all the parties to the transaction would be precisely the same.

"In the view I have taken above respecting the design of the legislature, this giving of notes for an existing demand, which would entitle the party to a lien upon the vessel, is to be regarded as entirely a collateral matter, which can in no way work a satisfaction or extinguishment of the lien within the two years, given by the act, until the indebtedness represented by such notes be actually paid. Regarding this, then, as collateral matter, no transactions between debtor and lien creditor, respecting these notes, save payment, can invalidate the lien of the mechanic, so long as the notes remain in his hands, at the time he claims upon his original demand, ready to be brought into court, and surrendered. How far the holder of such note could be considered the assignee or indorsee of a boat note, entitling him to a lien in the third class of section 1 of the act, is an entirely different question. To put any other construction upon this act, would be to enforce a technical rule to the injury of the parties for whose benefit the act was designed, not only, not in pursuance of the requirement of the statute, but in conflict with its spirit, and for the benefit of creditors, whose rights have been in no way affected

or impaired by the acts of the mechanics, to whom the notes were originally given.

"In the case of A. Adley (just considered with others,) in the July note, 1860, he gave a receipt, 'Received payment,' (exhibit 'J. H. B. Cl'k.') which is explained by the testimony that no money was paid therefor, and also by receipt in the case of the Vulcan, into which the Collier account thus receipted is carried, and receipted 'Received payment by note at four months,' thus showing the whole transaction. Such a case, as we have seen in that of G. B. Kurtz, can not affect the claim of the mechanic to his lien. The libel of Thomas Snowden shows that for the work done and materials furnished by him, a draft was finally given—being the renewal of a note first given, and that said draft is in the hands of and is owned by Park, McCurdy & Co. Treating Park, McCurdy & Co., as the real libellants, the question arises, have they a lien for this draft in their hands? I have allowed this claim under the express language of the fifth section, which provides, 'that the taking of any note, &c., in settlement of a debt comprehended in any of the above enumerated classes,' shall not invalidate the lien given. The original note in the hands of the assignee of the mechanic being within the third of the 'enumerated classes,' the taking of the draft in 'settlement' of the same, would seem to fall within the fifth section, being for 'a debt comprehended' in the third of 'the above enumerated classes.'

"It is contended that for all claims for work, materials, or supplies, the admiralty rule, that the libellants must prove that all such things furnished were necessary, should be applied. In the first place, it may well be urged that the parties having proven that the materials, &c., were ordered and furnished and used upon the boats, and that from their nature the materials seem to be necessaries, this would be a compliance with the rule, and moreover, the act provides a lien for 'all debts contracted by the owner, &c., for or on account of work and labor done, &c., in building, equipping, &c., of the boats'; and therefore it is not at all important to the mechanic whether they were necessary or not. It is sufficient for him that they were ordered and furnished, and it is no fault of his if useless things were furnished. The debt, therefore, has been contracted, and that fact entitles him to his lien.

"The only two remaining libellants in the state courts, are the Citizens' and the Monongahela Insurance Companies. It will be seen by the act of 1858, that insurers of a vessel seem to have got in by one of the not infrequent mistakes in this act. They come in the third class, but unlike the others, they draw their lien from the fact that they have taken a note for the insurance, and not because of the insurance, and without the taking of the note they would have no lien. As the note, then, is their principal contract, I think that should be specific and individual, and not so commingled with other transactions as to be indivisible. It is not enough to be able to say, 'here is a note for $1,000; in it there is included for insurance of the Collier, $200.' You could not extinguish the original debt, viz., the note—in the higher security, viz., the judgment, and have it delivered over to the debtor upon paying the judgment; for a portion of it is for matters not involved in the judgment at all. It seems to me that the libellant should be able to come into court, and present the ground of his demand, entirely distinct from every other transaction. The claims of the insurers here, are to be found in two or three different notes, united, as in the instance of the Citizens' Insurance Company, with other premiums and discounts. The last notes held by each, however, come within the rule laid down above. These are separate from all claims arising from other sources, and these I have allowed, deducting the abatement for returned premium—the boats having been sold before the expiration of the risk. All of the account, filed in the case of J. Irwin & Son, except the last two items, was furnished for the steamboat Black Diamond, which boat it seems was taken to pieces and considerable portions of her used in the construction of the Collier.

"It is contended that the lien for supplies will attach to the parts of the vessel, and should be paid out of the proceeds of the Collier. I have not been able to perceive the force of the position, and have, therefore rejected all items that were not expressly furnished to the Collier."

\*    \*    \*    \*    \*    \*    \*    \*    \*

The following opinion (McCANDLESS, District Judge), approving and adopting the views set forth in the report of the commissioner, was filed July 16, 1861.

PER CURIAM. I have considered this case, and the report of the commissioner is confirmed for the reasons assigned by him. A final decree is ordered accordingly.

NOTE [from 9 Pittsb. Leg. J. 73]. The sheriff of the county, in making up his costs in this case, has taxed $11.16 in each intervening claim. Exception has been taken thereto. It appears that this sum is made up of attorney's fees, $3: writ, $1.25; prothonotary's costs, $1.91; sheriff, $5.—total, $11.16.
It appears that the state act, establishing the fees of the sheriff, has made no provision for the case of attachments of vessels, and the sheriff has charged the fees usually taxed by marshals of the United States. Taking, however, the fees allowed the sheriff for our guide, he could be entitled to no more than one dollar for each service; and, having two parties here upon whom to serve the monitions, I have allowed that sum for each.
I can see no warrant for allowing an attorney's fee to each intervener, thus making several attorney's fees in one case, and that is not the practice in this court, and should not be anywhere. I have therefore struck out this fee, and taxed in the case of each intervener as follows: writ. $1.25; prothonotary. $1.91; sheriff,. $2,—total, $5.16, instead of $11.16.

Whereupon, I, John H. Bailey, clerk of the said court, do respectfully certify and report that I have, as above set forth, ascertained the amounts due the several libellants and interveners in this cause, and I do further certify and report that the schedule hereunto annexed, and marked "A," and made part of this, my report, contains a statement and account of the moneys so found due the several parties, as aforesaid, to which for greater certainty I refer. All of which is respectfully submitted. John H. Bailey, Clerk.

[Upon an appeal to the circuit court, the judgment of this court was affirmed. Case No. 13,-272a.]

